Roosevelt N. Nesmith, Esq. (008271997)
**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Telephone: (973) 259-6990
Fax: (866) 848-1368
*roosevelt@nesmithlaw.com*
*Attorneys for Plaintiffs and the Putative Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MONICA GRAY, AS EXECUTRIX OF THE ESTATE OF EARL GRAY, JR. AND AS TRUSTEE OF THE INTEREST OF JASMINE GRAY-OLIVER, AND JUSTIN GRAY, on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>CIT BANK, N.A., FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, QBE INSURANCE CORPORATION, QBE FIRST INSURANCE AGENCY, INC., AND MIC GENERAL INSURANCE CORPORATION,<br><br>      Defendants. | **CASE NO. 1:18-cv-01520**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Monica Gray, as Executrix of the Estate of Earl Gray, Jr. and Trustee of the Interest of Jasmine Gray-Oliver ("Monica Gray"), and Justin Gray (collectively with Monica Gray, "Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated, against defendants CIT Bank, N.A. ("CIT Bank"), Financial Freedom Senior Funding Corporation, a division of CIT Bank, N.A. ("Financial Freedom," and collectively with CIT Bank, the "Financial Freedom Defendants"), QBE Insurance Corporation ("QBE

Insurance") and, QBE FIRST Insurance Agency, Inc. ("QBE FIRST", and collectively with QBE Insurance, the "QBE Defendants"), and MIC General Insurance Corporation ("MIC General," and collectively with the Financial Freedom Defendants and the QBE Defendants, "Defendants").

## THE PARTIES

1.      Monica Gray is the appointed Executrix of the estate of Earl Gray, Jr. under the Last Will and Testament of Earl Gray, Jr. dated November 20, 2009 (the "Earl Gray Will").  Earl Gray, Jr. ("Earl Gray" or "Gray"), resided at 815 James Street, Cinnaminson, New Jersey (the "Gray Property") for more than 40 years until his death on December 3, 2016.  Gray obtained a reverse mortgage from Financial Freedom secured by the Gray Property in November 2008.  He devised the Gray Property to Monica Gray's children, Justin Gray and Jasmine Gray-Oliver, per stirpes, subject to their interests being held by the Trustee under the Earl Gray Will until the devisee reaches age 21.  Monica Gray is a New Jersey citizen and has resided at the Gray Property with her children, Justin Gray and Jasmine Gray-Oliver, since 2010.

2.      Justin Gray is a devisee of a one-half fee interest in the Gray Property pursuant to the Gray Will.  He is 22 years old and a New Jersey resident and has resided at the Gray Property since 2010.

3.      Jasmine Gray-Oliver is a devisee of a one-half fee interest in the Gray Property pursuant to the Gray Will.  Her interest in the Gray Property is held by the Trustee named in the Earl Gray Will until she reaches the age of 21.  Jasmine Gray-Oliver is 15 years-old.  Her mother, Monica Gray, is the Trustee of Jasmine Gray-Oliver's interest in the Gray Property under the Earl Gray Will.  Jasmine Gray-Oliver is a New Jersey resident and has resided at the Gray Property since 2010.

4.      Defendant Financial Freedom is a Delaware corporation with its principal place of business located at 2900 Esperanza Crossing, Austin, TX 78758.

5.      Defendant CIT Bank is a wholly owned subsidiary of CIT Group, a financial holding company, with its principal place of business located at 75 North Fair Oaks Avenue,

Pasadena, California.  CIT Bank is the banking subsidiary of CIT Group, Inc., and has more than

$30 billion of deposits and more than $40 billion of assets. It provides financing, leasing and

advisory services principally to middle market companies across more than 30 industries

primarily in North America, and equipment financing and leasing solutions to the transportation

sector. It also offers products and services to consumers through its Internet bank franchise and a

network of retail branches in Southern California, operating as OneWest Bank, a division of CIT

Bank.

6.       Defendant QBE Insurance Corporation is an insurance company that provides

force-placed insurance.  It is a subsidiary of QBE Insurance Group ("QBE"), one of the world's

top 20 general insurance and reinsurance companies, during the relevant period.  QBE

Insurance's principal place of business is located at 88 Pine Street, New York, New York 10005.

7.       Defendant QBE FIRST Insurance Agency, Inc. ("QBE FIRST"), is a QBE

subsidiary with its principal place of business at 9800 Muirlands Boulevard, Irvine, California.

QBE formed QBE FIRST from the former ZC Sterling Corporation ("ZC Sterling"), which QBE

acquired in 2008.  ZC Sterling had managed forced-placed insurance programs for other insurers.

QBE changed ZC Sterling's name to Sterling National Corporation after the purchase, and then

to QBE Financial Institution Risk Services, Inc., which is QBE FIRST's direct parent, in 2011.

QBE FIRST acts as a program manager for QBE lender-placed insurance programs.

8.       Defendant MIC General Insurance Company ("MIC General") is an insurance

company that provides force-placed insurance.  It is a subsidiary of National General Holdings

Corp., with a principal place of business at 3044 West Grand Boulevard, Detroit, MI 48202.

National General Holdings Corp. acquired the lender-placed insurance business of QBE

subsidiary QBE North America, in October 2015.

## JURISDICTION AND VENUE

9.       This Court has jurisdiction over this action pursuant to the Class Action Fairness

Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28

U.S.C.)

3

10.     Plaintiffs Monica Gray and Justin Gray are citizens of New Jersey.

11.     Defendant CIT Bank is a citizen of California.  Defendant Financial Freedom is a citizen of Texas, Defendant QBE Insurance is a citizen of New York, Defendant QBE FIRST is a California citizen and Defendant MIC General is a Michigan citizen.  The amount in controversy exceeds $5,000,000, and there are at least one hundred members of the putative class.

12.     This Court has jurisdiction over Defendants because they either are foreign corporations authorized to conduct business in New Jersey, are doing business in New Jersey and have registered with the New Jersey Secretary of State, or do sufficient business in New Jersey, have sufficient minimum contacts with New Jersey, or otherwise intentionally avail themselves of the New Jersey consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in New Jersey.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

13.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

14.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District and a substantial portion of the practices complained of herein occurred in the District of New Jersey.

4

15.     All conditions precedent to this action have occurred, been performed, or have been waived.

## NATURE OF THE CASE

16.     Plaintiffs have brought this action to redress injuries which they and the Class have suffered, and will continue to suffer, as a result of Defendants' unlawful practices relating to the servicing of reverse mortgages.  In connection with their loan servicing, Defendants have wrongfully manipulated the force-placed insurance market through collusive agreements employing kickback arrangements and other forms of improper benefits from force-placing insurance coverage on borrowers' property.  Plaintiffs do not challenge Financial Freedom's ability to obtain force-placed insurance to protect its interest in the borrowers' loans it services as set forth in their mortgage agreements.  Rather, they challenge its manipulation of the force-placed insurance process through its scheme with the other Defendants to enrich itself and the other Defendants at the expense of Plaintiffs and the Class.  Defendants' practices have resulted not only in imposing unwarranted and excessive charges for insurance and inspection fees on the reverse mortgage loans it services, but also led to unprecedented rates of reverse mortgage foreclosures and the eviction of elderly consumers from their homes.

17.     Defendants' unlawful actions include, *inter alia*,

(a) Financial Freedom purchasing high-priced insurance policies from force-placed insurance providers QBE Insurance and MIC General, through their agent, QBE FIRST, and imposing inflated charges on Plaintiffs and other borrowers' mortgage accounts falsely attributed to the cost of insurance, but which include, *inter alia*, undisclosed kickbacks in the form of unearned "commissions," reinsurance profits without transfer of risks, and discounted loan tracking services;

(b) Financial Freedom entering into an exclusive relationship with the QBE Defendants and MIC General for the placement of force-placed insurance policies on the

Financial Freedom mortgage loan portfolio in order to receive unearned "commissions" and reinsurance profits, low cost or no cost loan tracking and loan monitoring services and other wrongful benefits from the QBE Defendants and MIC General, in exchange for Financial Freedom's agreement to use QBE FIRST as its exclusive force placed insurance brokers;

(d) QBE FIRST's prearranged relationship with QBE Insurance and MIC General as the exclusive force-placed insurance providers for the Financial Freedom loan portfolio, whereby QBE FIRST receives a commission from QBE Insurance or MIC General for policies placed with Financial Freedom, calculated as a percentage of the total net written premium of force placed policies on the Financial Freedom loan portfolio, a portion of which QBE FIRST then kicks back to Financial Freedom;

(e) Financial Freedom placing retroactive or backdated force placed insurance policies on Plaintiffs' and other borrowers' properties to cover periods of time which have passed and during which the property was not damaged, and no claims were made;

(f) Financial Freedom charging Plaintiffs and other borrowers for unwarranted inspection fees when the resident has provided proof of occupancy, Financial Freedom has been in contact with the resident, and/or Financial Freedom has no reasonable basis to believe that the property is vacant;

(g) Financial Freedom deeming the reverse mortgage "due and payable" as a result of the unwarranted insurance charges, inspection fees and unfounded vacancy reports; and

(h) Financial Freedom forcing the borrowers into foreclosure as a result of the fraudulently inflated insurance charges, duplicative, unnecessary and backdated force placed insurance policies, and/or unwarranted inspection fees to so that its parent company, CIT Bank, can meet the deadlines to collect interest on the reverse mortgages from the Federal Housing Administration and reclaim the property through foreclosure proceedings.

## The Force-Placed Insurance Industry

18.     As the fifty State Attorneys General have recognized, the practice of force placing insurance on homeowners has contributed to and exacerbated the foreclosure crisis.  Force-placed insurance policies are generally meant to protect a mortgagee's interest in the borrower's property when the borrower's insurance policy has lapsed.  Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to force-place new insurance coverage on the property to protect its interest in the loan and to charge the premium to the borrower.

19.     Mortgage servicers – like Financial Freedom here – are companies that contract with the owners/investors of residential mortgage loans to administer those loans on behalf of the owners/investors.  They are responsible for the day-to-day management of the mortgage loan account, including collecting and crediting the monthly loan payments, handling the escrow account, monitoring loans to confirm hazard insurance coverage and continuing or placing coverage if there is a lapse in coverage, and otherwise handling customer service and management of the mortgage loans within their servicing portfolio.

20.     Force-placed insurance providers, such as the QBE Defendants and MIC General here, provide mortgage servicers with force-placed hazard, flood and wind insurance products. They also provide administrative and loan tracking services through which they assume the servicers' responsibilities for day to day management of the force-placed insurance program.

21.     Mortgage servicers and force-placed insurance provides have corrupted the force-placed insurance process, turning it into an inflated profit-making machine for themselves at the expense of homeowners.  The force-placed insurance providers enter exclusive relationships with mortgage lenders and servicers to provide force-placed insurance policies, administrative and

loan tracking services.  To maintain their exclusive relationships with the lenders and servicers, the insurance providers remit kickbacks, euphemistically termed "commissions," to the lenders and servicers, sometimes through an intermediate insurance broker such as QBE FIRST here, when the high-priced, force-placed insurance coverage is placed on a property.  When a mortgage servicer force places insurance coverage on a borrower, a percentage of the premium attributed to that coverage – the entirety of which is charged to borrower's mortgage account – is paid back to the mortgage servicer or a related entity in the form of "kickbacks" and/or unearned "commissions," even though there is no work performed by the mortgage servicer in connection with the individual insurance placement.

22.     This arrangement provides the mortgage servicer with an incentive to purchase the highest priced force-placed insurance policy that it can because the higher the cost of the insurance coverage, the higher the commission or kickback to the mortgage servicer.  Mortgage servicers consistently choose force-placed insurance arrangements that reward themselves at the expense of the borrowers.  The National Association of Insurance Commissioners stated that mortgage servicers "have no incentive to select a competitively priced product" but instead would select one "where they are provided with an incentive or inducement to enter into the transaction."  The money to finance the force-placed insurance scheme comes from unsuspecting borrowers, upon whom are imposed high-priced force-placed insurance coverage that includes undisclosed kickbacks and other wrongful benefits.

23.     Defendants here have improperly engaged in self-dealing at the expense of Plaintiffs and the Class by charging Plaintiffs and the other members of the Class the exorbitantly-priced, unnecessary and excessively backdated force-placed insurance coverage for coverage not required by the mortgage agreement, and paying and receiving a percentage of the

excessive force placed premium to each other, thereby enabling Defendants to earn a hidden profit and financial windfall.  The price of the unnecessary force placed insurance coverage which Financial Freedom obtains from the QBE Defendants and MIC General through QBE FIRST, and imposed on borrowers is excessive, and for many elderly people with reverse mortgages, the inflated charges for the force placed policies obtained by Financial Freedom create an untenable burden on a fixed income.

24.     Force-placed insurance policies are extremely lucrative for the insurance providers.  The *American Banker* reported that ". . . force-placed policies generate profit margins unheard of elsewhere in the insurance industry—even after accounting for the generous commissions and other payments that servicers demand."  *See* J. Horowitz, *Ties to Insurers Could Land Mortgage Servicers in More Trouble*, AM. BANKER (Nov. 10, 2010), *available at* http://www.americanbanker.com/issues/175_216/ties-to-insurersservicers-in-trouble-1028474-1.html.

25.     During a 2012 hearing on force-placed insurance at the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, an expert on the force-placed insurance

market, illustrated the staggering growth in profits that Defendants' schemes have reaped:[1]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|---|---|---|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

26.    The QBE Defendants were one of a small number of insurance companies that controlled virtually the entire market for force-placed insurance during much of the relevant period.   They had the second largest lender placed insurance platform in the United States in 2014.  Their hazard and flood insurance products produced $390 million in gross-written premium and they tracked 7.8 million home loans as of December 31, 2014.[2]  As shown below, QBE held 41.1% of the nationwide market share for force-placed insurance in 2011.  Together, QBE/Balboa and Assurant, the other major insurer with a signification market share, controlled

---

[1] This graph and the ones that follower are from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at: http://www.naic.org/documents/committees_c_120809-public_hearing_lender_placed-insurancepresentation_birnbaum.pdf.

[2] *See National General Holdings Corp. Announces Closing of Acquisition of Lender-Placed Insurance Business of QBE North America, October 1, 2015, available at* http://ir.nationalgeneral.com/news-releases/news-release-details/national-general-holdings-corp-announces-closing-acquisition

99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.

### Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                    August 9, 2012

27.    Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the insurers in exchange for kickbacks disguised as commissions and other benefits.  Upon information and belief, defendant Financial Freedom purchased force-placed insurance from the QBE Defendants and MIG General pursuant to a prearranged agreement which returns a financial benefit to Financial Freedom and/or its affiliates that is unrelated to any contractual or bona fide interest in protecting Financial Freedom's interest in the loan.  Pursuant to its agreement, it purchases unconscionably high-priced insurance policies from the QBE Defendants and MIC General, and in exchange, defendant Financial Freedom and/or its affiliates, receive fees, payments, commissions, kickbacks, ceded reinsurance or other things of value from the QBE Defendants and MIC General.  Financial Freedom then charges its borrowers an amount it claims is the cost of insurance, but in fact

includes the secret fees, commissions, kickbacks and other illicit consideration the QBE

Defendants and MIC General kick-back to Financial Freedom or its affiliates.

28.     The Financial Freedom Defendants' desire to reap greater profit through their

prearranged agreements with the QBE Defendants and MIC General leads Financial Freedom to

select the force-placed insurance from the QBE Defendants and MIC General for its borrowers in

order to obtain the wrongful kickbacks.  As a result, the charges for force-placed coverage that

Financial Freedom imposes on borrowers' mortgage accounts are greater than what Defendants

represent to be the actual cost of the insurance.  Through this manipulation of the force-placed

insurance selection process, Defendants maximize their own profits to the detriment of Plaintiffs

and the other members of the Class.

29.     Defendant Financial Freedom also charges its borrowers unwarranted inspection

fees, even when the borrower has provided it with notice of occupancy or has been in contact

with it, and it has no reasonable basis to believe the property is vacant.  Nonetheless, Financial

Freedom charges the borrowers' mortgage accounts for property inspections.  In addition,

Financial Freedom deems properties vacant in order to declare the reverse mortgage in default

and foreclose immediately

30.     It is no surprise that the Defendants' practices have come under increased

scrutiny in recent years by the government and regulators.  For example:

- In April 2013, the New York Department of Financial
  Services' Financial Frauds & Consumer Protection Division
  ("NYDFS"), investigation into force-placed insurance
  practices reached a settlement with QBE Holdings, Inc., and its
  subsidiaries QBE Insurance and QBE Financial Institution Risk
  Services, Inc., that included a $10 million penalty paid to the
  State of New York  and required it to lower its force-placed

insurance rates going forward from that date."[3] Further, under the Consent Order, the QBE Defendants are prohibited from paying commissions to any servicers, or entity affiliated with a servicer, on force-placed insurance policies obtained by the servicer. *See* QBE Defendants Consent Order, April 18, 2013.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

31.   The NYDFS 2013 Consent Order with the QBE Defendants also required

them to refrain from reinsuring force-placed policies with affiliates of servicers, paying

---

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at* http://www.dfs.ny.gov/about/press/pr1304181.htm

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*, BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at* http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

contingent commissions based on underwriting profitability or loss ratios, and providing free or below cost outsourced services to servicers, lenders or their affiliates.

32.     In another instance, after pressure from the California Insurance Commissioner, one lender placed provider announced that it will be slashing its force-placed insurance rates by approximately 30%.  Dave Jones, the California Insurance Commissioner released a statement saying, "[m]y directive for insurers to submit new rate filings, and subsequent review of those filings, confirmed that rates *were indeed excessive and needed to be lowered*" (emphasis added). *See* Bibeka Shrestha, *Assurant to Drastically Cut Force-Placed Rates in Calif.*, *available at* http://www.law360.com/articles/388842/*print?section=privacy*

33.     New Jersey, which was not subject to the NYDFS 2013 Consent Order with QBE, is a substantial market for these force-placed insurance schemes.  In his presentation to the NAIC, Mr. Birnbaum illustrated that New Jersey has been the sixth largest market for force-placed insurance policies in the county.

## LPI Premium by State:  Florida Has Become Ground Zero

|     | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|-----|-------|-------|-------|-------|-------|-------|-------|-------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY  | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL  | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ  | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI  | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH  | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA  | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA  | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

34.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by Financial Freedom, the QBE Defendants and MIC General.

35.     Upon information and belief, the Financial Freedom Defendants negotiated deals with the QBE Defendants and MIC General, whereby Financial Freedom receives a percentage of the total net written premium of the force-placed insurance policies purchased for borrowers whose loans it services.  This unearned commission or kickback structure encourages Financial Freedom to select the most expensive insurance policy, despite not having an interest in the insured collateral.

36.     Upon information and belief, the QBE Defendants and MIC General pay unearned commission or kickback to the Financial Freedom Defendants to induce Financial Freedom to purchase high-priced force-placed insurance policies from the QBE Defendants and MIC General through QBE FIRST.  The full price of the force-placed insurance coverage (without accounting for the kickback that is paid back to the servicer) is charged to the borrower by the mortgage servicer, and can often force elderly homeowners on a fixed income into foreclosure.

37.     Financial Freedom's force-placed insurance charges to borrowers are also inflated by the interest that accrues on the mortgage accounts.  Under the typical mortgage agreements, amounts disbursed by Financial Freedom for force-placed insurance are added to borrowers' loan balances as "additional debt" and accrue interest.  When Financial Freedom adds its charges for the force-placed insurance to the loan balances—including its kickbacks, it increases the interest

charged to the borrower over the life of the loan.  As a result, the borrower is charged interest on the kickback received by the Financial Freedom Defendants.

38.     Upon information and belief, the QBE Defendants and MIC General also may provide other improper incentives to the Financial Freedom Defendants, including low cost or below market loan tracking and portfolio monitoring services as an additional incentive to obtain force placed insurance policies from the QBE Defendants and MIC General.  The providing of loan tracking and portfolio monitoring services is properly the function of the loan servicer, not the insurance provider or agent.  Indeed, it is the responsibility and function of Financial Freedom to service the reverse mortgages in its portfolio and adhere to federal regulations governing reverse mortgage servicing.  Third party vendors like the QBE Defendants and MIC General are not authorized to service reverse mortgages, nor are they held accountable to HUD for compliance with federal regulations.  Third party vendors like the QBE Defendants and MIC General thus do not have any legal authority to act; instead, the QBE Defendants and MIC General act as an agent of Financial Freedom.  Third party vendors do not provide the very few consumer protections defined in the reverse mortgage deed of trust and note.  By outsourcing loan servicing and insurance tracking to the QBE Defendants and MIC General, Financial Freedom has skirted its duty to adhere to federal regulations and compliance standards for reverse mortgage servicing.  Moreover, while the loan tracking services are performed for the entire Financial Freedom loan portfolio, the cost of these services is imposed only on those unfortunate borrowers with the force placed policies.

39.     Financial Freedom imposes on Plaintiffs and the other Class members inflated charges attributed to the force-placed insurance premium, despite being paid unearned

16

commissions, receiving below cost or discounted loan tracking services, and other kickbacks from the QBE Defendants and MIC General.

40.     The proceeds of a house sold at a foreclosure auction will go to the mortgage holder – here, Defendant CIT Bank, of which Financial Freedom is a division.  It is a win- win situation for Defendants Financial Freedom, CIT Bank, and CIT Group:  The Financial Freedom Defendants receive lucrative unearned "commission" payments from the force placed insurance arrangement and when the reverse mortgage borrower is unable to pay the inflated charges attributed to the force placed insurance coverage, CIT Bank can commence foreclosure proceedings.

## The Reverse Mortgage Industry

41.     Reverse mortgages are government backed loans that allow Americans over the age of sixty-two (62) to borrow against the value of their homes.  Borrowers do not have to pay the interest incurred on their reverse mortgage loan and can live in their homes for life.  A sale of the property can be used to repay the debt.   The reverse mortgage loans are backed by insurance from the Federal Housing Administration ("FHA").  When a loan comes due, the loan servicer can earn interest on the loan from the FHA by meeting deadlines for certain tasks such as getting an appraisal and starting the foreclosure process.  If the loan servicer misses the FHA deadlines, the servicer is not entitled to earn interest from the FHA while waiting for the agency to pay its claim.

42.     Traditionally, a reverse mortgage is meant to come due and payable when the resident dies.  However, there are other events which may cause the reverse mortgage to become due and payable, such as the borrower's failure to pay force-placed insurance charges or the property is deemed vacant, thus enabling the loan servicer to commence foreclosure proceedings.

43.     Financial Freedom originated and serviced reverse mortgages until 2011.  It aggressively marketed reverse mortgages to elderly consumers and featured celebrity pitchman James Garner in its television commercials.  In 2011, Financial Freedom stopped making new loans and operated exclusively as a reverse mortgage loan servicer.  Although Financial Freedom has not originated any new reverse mortgages since 2011, it maintains a large servicing portfolio.  In December 2015, a Fitch Ratings Report stated that Financial Freedom's servicing portfolio consisted of 104,050 loans, with an unpaid balance of approximately $20.6 billion as of March 31, 2015.  Data from the Department of Housing and Urban Development shows that while Financial Freedom services approximately 17% of all reverse mortgages nationwide, it is responsible for approximately 39% of all foreclosures on reverse mortgages nationwide since 2009.

44.     Financial Freedom's unprecedented rate of foreclosures on reverse mortgages is by design:  It imposes on it borrowers, all of whom are senior citizens, unwarranted force-placed insurance charges and inspection fees, then wrongfully deems the reverse mortgages due and payable when the borrowers cannot pay the exorbitant and unwarranted charges and/or deems the property vacant based on bogus and unwarranted inspections, the cost of which are charged to the borrower.

45.     When the inflated insurance is force-placed on homeowners, many of whom with reverse mortgages are on a fixed income, it imposes on them undisclosed, unnecessary and excessive costs, and often pushes them into foreclosure.  Financial Freedom's charges to borrowers' accounts attributed to force-placed insurance coverage is at least five to six times, and often up to ten times, greater than what the borrower was either paying originally for voluntary homeowner's insurance or what the borrower could obtain on the open market.  The inflated force-placed insurance charges increases the borrowers' loan balances, and the corresponding decline in borrower equity; accelerating the depletion of the senior citizen borrowers' equity and the slide toward foreclosure.

46.     That is the case here with respect to Plaintiffs and numerous members of the Class.  Financial Freedom used unpaid, inflated, charges from unnecessary force placed insurance coverage it obtained from the QBE Defendants and MIC General and force-placed on the Gray Property, as grounds for its parent company, defendant CIT Bank, to commence foreclosure proceedings against Gray.

47.     Financial Freedom may also overcharge borrowers by imposing insurance coverage that exceeds the amount necessary to protect the lender's interest in the borrowers' properties.  Gray and Class members' mortgages authorize the lender to impose insurance coverage necessary to protect its interest in the borrowers' property.  However, the amount of coverage imposed on borrowers may far exceed the lenders interest in the property.  For example, Defendants force-placed insurance coverage on Gray's property in November 2015, in the amount of $330,000, and charged him $2,230.90 for it.  Gray's loan balance at the time was only $262,363.  The Defendants force-placed insurance coverage exceeded Financial Freedom's interest in the Gray Property by 25 percent.

48.     Defendant Financial Freedom may also be overcharging borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form insurance agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination or lapse of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date  of termination, and  "double-cover"  the  property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

49.     Borrowers such as Plaintiffs and the other Class Members are typically notified by mail or in their mortgage contracts that the cost of the force placed insurance may be higher than the amount they would typically pay for insurance obtained on the open market.  These notices usually state that the insurance will cover the lender but may or may not protect the borrower or the contents of the property, and that the insurance obtained by the lender may be

more expensive than the insurance obtained by the borrower. There are no insurance rates or premiums set forth in the mortgage contract for the cost of force-placed insurance policies.

50.     Neither the mortgage contract nor any subsequent notice, however, inform the borrower that Financial Freedom, the mortgage servicer, will receive unearned "commissions" and/or kickbacks from the QBE Defendants and/or MIC General, for purchasing the forced placed insurance from them. Nor is it disclosed to the borrower that unearned commission fees and/or kickbacks simply will be based upon a percentage of the charge attributed to the premium for the force-placed insurance and charged to the borrowers.

51.     Instead, Financial Freedom misrepresents to borrowers that they will only be charged for the cost of the insurance. In fact, borrowers are charged an amount greater than the cost of the insurance; an amount inflated by the unearned commission fees and/or kickbacks.

52.     Plaintiffs and the other Class members do not have any choice or input into what company is used to force-place the insurance policy, or what expenses are incurred in "finding" an insurance company. Nor do they have the option to shop for the insurance service themselves.

53.     The force-placed insurance coverage is not the same type of policy that is authorized or required by the mortgage contract and is not one that a borrower could find on the open market. This is especially true where Financial Freedom has force-placed back dated policies that provide for coverage for periods of time already passed during which the property did not suffer damages and no claims had been made.

### Unwarranted Inspection Fees and Illegitimate Vacancy Reports

54.     In addition to charging senior citizen borrowers for unnecessary and exorbitant force placed insurance, Financial Freedom has charged them for unwarranted inspection fees, even when the resident has provided Financial Freedom with notice of occupancy or has been in contact with Financial Freedom, and Financial Freedom has no reasonable basis to believe the property is vacant. Without reason or good cause, Financial Freedom deems properties vacant in order to call in the reverse mortgage as due and payable to the HUD.

55.     As a loan servicer with loans owned by an investor, Fannie Mae, Financial Freedom is required to follow the servicing guidelines of Fannie Mae.  Failure to comply with these guidelines is probative of a failure on the part of the loan servicer to comply with state consumer protection laws.  Moreover, the Fannie Mae servicing guidelines clarify what is "reasonable or appropriate" under the mortgage agreement.

56.     With respect to property inspections, Section 303 of the 2015 Fannie Mae Servicing Guidelines provide:

> Generally, the servicer does not have to inspect a property that secures a delinquent mortgage loan if it has established [Quality Right Party Contact ("QRPC")][5] with the borrower and is working with the borrower to resolve the delinquency … or a full payment has been received within the last 30 days.

> The servicer must order the property inspection by the 45th day of delinquency and complete the property inspection no later than the 60th day of delinquency if QRPC has not been achieved or a full payment has not been received within the last 30 days. The servicer must continue to obtain property inspections every 30 days until it establishes QRPC as long as the mortgage loan remains 45 days or more delinquent.

57.     This provision is necessary to ensure the property is occupied when a loan servicer has been *unable to establish contact with the borrower* and loan payments have not been received.  But the provision does not authorize or permit inspections when the loan servicer is in contact with the borrower and knows the property to be inhabited, such as when the borrower provides a notice of occupancy to the loan servicer, or after the borrower has come current.

58.     As detailed herein, Plaintiffs and other members of the Class have been in contact with Financial Freedom and achieved QRPC under the Fannie Mae Servicing Guidelines.  Yet, Financial Freedom ordered property inspections, which were charged to the borrower's mortgage

---

[5] The "Quality Right Party Contact" or QRPC is Fannie Mae's "uniform standard for [loan servicers] communicating with the borrower, co-borrower, or a trusted advisor (collectively referred to as "borrower") about resolution of the mortgage loan delinquency."  Servicing Guide: Fannie Mae Single Family, Part D, Subpart 2, Chapter 2, at 399.

balance, without a legitimate basis solely to generate fees and call in the reverse mortgages as due and payable and commence foreclosure proceedings.

59.     In addition, the United States Department of Housing and Urban Development imposes a limitation on loan servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377 provides, in pertinent part:

> The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, *and efforts to reach the mortgagor by telephone within that period have been unsuccessful*, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

(emphasis added).

60.     Upon information and belief, Financial Freedom utilizes a software-based servicing system which automatically orders a property inspection, and charges the borrower's account for the inspection, if a borrower is in default. The only criterion for the inspection to be ordered and charged is that the loan has been in default for a certain number of days. The inspection is ordered and charged regardless of whether there is a lawful and reasonable basis for ordering the inspection or whether the borrower may be legally charged for the inspection.

61.     Financial Freedom, and its automated servicing system, intentionally ignores whether borrowers, including Plaintiffs, are obviously living in their homes at the time of the inspections, have provided proof of occupancy, or otherwise have been in contact with Financial Freedom by telephone or written correspondence.

62.     The unwarranted charging of inspection fees, and the wrongful placement of unnecessary and excessive force placed insurance practices alleged herein allow the Defendants

to reap huge profits at the cost of the Plaintiffs and the other Class Members by imposing excessively-priced insurance coverage not required by the reverse mortgage agreement on elderly borrowers, receiving unearned commissions and below cost loan tracking services as an incentive to do business with the insurance providers, charging unwarranted inspection fees, and ultimately, by forcing the reverse mortgage borrowers into foreclosure so defendant CIT Bank can reclaim the property and wrongfully displace elderly consumers from their homes for profit.

63.     The actions and practices described above represent unfair, deceptive, and fraudulent practices that, even if the terms of the mortgage could be construed to allow, would still be an abusive and unlawful use of contractual powers.  The Defendants' practices in placing these inflated, backdated, and unnecessary force placed insurance coverage on Plaintiffs and other Class members, and charging them unwarranted inspection fees, solely to maximize Defendants' own profits is inherently unfair and deceptive and prohibited by law.

64.     It is not by chance that Financial Freedom is responsible for 39% of the 41,237 Home Equity Conversion Mortgage ("HECM") foreclosures that have occurred since April 2009. Commenting on the high rate of foreclosures on reverse mortgages serviced by Financial Freedom, Kevin Stein, an associate director of the California Reinvestment Coalition, a non-profit organization that advocates for fair and equal access to banking and other financial services for California's low-income communities and communities of color, stated, "The data HUD provided [on Financial Freedom foreclosures] is a red flag that something is amiss at Financial Freedom."

65.     Maeve Elise Brown, the executive director at Housing and Economic Rights Advocates, a California- based not-for-profit legal service and advocacy organization, stated that, "This newly uncovered data about Financial Freedom's outsized role in HECM foreclosures is troubling, and suggests the need for a thorough and transparent investigation."

66.     In November 2014, the California Reinvestment Coalition served a Freedom of Information Act ("FOIA") request on the HUD, seeking, *inter alia*, data concerning the number of complaints filed against Financial Freedom, the number of foreclosures the company had

conducted since 2009, and the number of "widow foreclosures" nationally.  In April 2016, in its response to the FOIA request, HUD told the California Reinvestment Coalition that it could not supply all of the information requested, including complaint data about Financial Freedom, because, "[i]t will require a dedicated full-time person approximately 120 years to compile complaint data."

67.     In October 2017, the U.S. Department of Justice announced that Financial Freedom had agreed to an $89 million settlement with the United States concerning its allegations that Financial Freedom had wrongfully obtained FHA mortgage insurance payments by falsely reporting that it had met certain deadlines relating to appraisal of properties, submission of claims to HUD and pursuit of foreclosure proceedings on reverse mortgage loans.[6]

68.     Upon information and belief, it is the Defendants' wrongful force placed insurance charges and unwarranted inspection fees, as detailed herein which have forced many elderly persons into foreclosure and account for much of Financial Freedom's sky-high foreclosure rates.

## The Estate of Earl Gray, Jr.

69.     Earl Gray obtained a HECM from Freedom Financial, through the State of New Jersey Housing & Mortgage Agency the (the "NJHMA"), secured by a mortgage on real property in Cinnaminson, New Jersey, on November 17, 2008.  Mr. Gray was over the age of 62 when he acquired his reverse mortgage, as required to be eligible for the Federal Housing Administration's HECM.

70.     At the time Gray obtained his Financial Freedom HECM it operated under the moniker "Financial Freedom Senior Funding Corporation" and on the mortgage listed its address as 192 Technology Parkway, Suite 100, Norcross, Georgia 30092.  In the assignment of

---

[6]  *See* Financial Freedom Settles Alleged Liability for Servicing of Federally Insured Mortgage Loans for $89 Million, available at *https://www.justice.gov/opa/pr/financial-freedom-settles-alleged-liability-servicing-federally-insured-reverse-mortgage*

mortgage also, executed November 17, 2008, it identified itself under the moniker "Financial Freedom Senior Funding Corporation" and identified its address as 500 Northridge Road, Suite 500, Atlanta, Georgia, 30350.

71.     Gray's reverse mortgage with Financial Freedom requires, *inter alia:*

> 2.  **Payment of Property Charges**.  Borrower shall pay all property charges consisting of taxes, ground rents, flood and hazard insurance premiums, and special assessments in a timely manner, and shall provide evidence of payment to Lender, unless Lender pays property charges by withholding funds from monthly payments due to the Borrower or by charging such payments to a line of credit as provided for in the Loan Agreement."

> 3.  **Fire, Flood and Other Hazard Insurance**.  Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire.  This insurance shall be maintained in the amounts, to the extent and for the periods required by the Lender or the Secretary of Housing and Urban Development ("Secretary").  Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary.  The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor or, and in a form acceptable to, Lender."

> * * * * *

> 5.  **Charges to Borrower and Protection of Lender's Rights in the Property**.

> * * * * *

> If Borrower fails to make these payments or the property charges required by Paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, . . . then Lender may do and pay whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in Paragraph 2.

> To protect Lender's security in the Property, Lender shall advance and charge to Borrower all amounts due to the Secretary for the Mortgage Insurance Premium as defined in the Loan Agreement as well as all sums due to the loan servicer for servicing activities as defined in the Loan Agreement.  Any amounts disbursed by Lender under this Paragraph shall become an additional debt of Borrower as provided for in the Loan Agreement and shall be secured by this Security Instrument.

6. **Inspection.**  Lender or its agent may enter on, inspect or make appraisals of the Property in a reasonable manner and at reasonable times provided that Lender shall give Borrower notice prior to any inspection specifying a purpose for the inspection or appraisal which must be related to the Lender's interest in the Property.  If the Property is vacant or abandoned or the loan is in default, Lender may take reasonable action to protect and preserve such vacant or abandoned Property without notice to the Borrower.

* * * * *

9. **Grounds for Acceleration of Debt.**

* * * * *

(b) Due and Payable with Secretary Approval.  Lender may require immediate payment in full of all sums secured by this Security Instrument, upon approval of the Secretary, if**:**

(i)  The Property ceases to be the principal residence of a Borrower for reasons other than death and the Property is not the principal residence of at least one other Borrower; or

(ii) For a period of longer than twelve (12) consecutive months, a Borrower fails to occupy the Property because of physical or mental illness and the Property is not the principal residence of at least on other Borrower;

(iii) An obligation of the Borrower under this Security Instrument is not performed.

72.     Defendant Financial Freedom began force-placing hazard insurance coverage on

Earl Gray's property beginning in 2011.  On February 9, 2011, it charged Gray's mortgage

account for force-placed insurance it obtained from Balboa Insurance Group.[7]  Mr. Gray's loan

balance was less than $194,000 in February 2011.  Financial Freedom imposed a charge on Gray's

---

[7] QBE announced its acquisition of the lender-placed insurance assets and liabilities of Balboa Insurance Company and affiliated entities from Bank of America Corporation in February 2011. The transaction was completed in June 2011.  *See* https://investor.bankofamerica.com/phoenix.zhtml?c=71595&p=irolnewsArticle&ID=1569942#fbid=0lvzSH3hcls.

mortgage account attributed to the Balboa force-placed hazard policy premium in the amount of $3,510.00.

73.     Financial Freedom renewed the force-placed insurance from the QBE Defendants in 2012, 2013, 2014, 2015, 2016 and 2017.  Financial Freedom charged Gray's mortgage account for insurance it identified as having been obtained from the QBE Defendants, or MIC General with respect to 2017, on the following dates and amounts:

| November 23, 2011 | $3,510.00 |
| November 7, 2012 | $2,796.95 |
| November 6, 2013 | $2,230.90 |
| November 5, 2014 | $2,230.90 |
| November 9, 2015 | $2,230.90 |
| November 7, 2016 | $2,064.41 |
| November 7, 2017 | $2,257.06 |

74.     Financial Freedom and the QBE Defendants mailed a notice to Earl Gray dated October 3, 2013 stating that "[t]he hazard insurance policy Financial Freedom, a division of OneWest Bank, FSB purchased on your behalf expires in 30 days."  It further stated that "if we purchase insurance on your behalf, the cost of that insurance will be charged to the outstanding balance of your loan and, if there are insufficient funds in your line of credit, arrangements will have to be made for repayment."  The October 2013 notice stated that the "approximate cost of the Lender-Placed insurance will be $2,230.90" for the period 11/02/2013 to 11/02/2014.  Financial Freedom charged Grays's mortgage account $2,230.90 on November 6, 2013.  The insurance coverage amount was $330,000.  The outstanding principle balance of Gray's loan was $235,600.

75.     Financial Freedom and the QBE Defendants mailed another notice to Earl Gray dated November 2, 2015 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2015.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2015 notice stated that the "insurance charges" were $2,230.90 for the period 11/02/2015 to 11/02/2016.  Financial Freedom charged Grays's mortgage account $2,230.90 on November 9, 2015.  The insurance coverage amount was $330,000.  The outstanding principal balance on Gray's loan was $262,363.

76.     Financial Freedom mailed another notice to Earl Gray dated November 9, 2017 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2017.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2017 notice stated that the "insurance charges" were $2,357.06 for the period 11/02/2017 to 11/02/2018.[8]  The insurance coverage amount was $330,000.  The outstanding principal balance on Gray's loan was $298,900.

77.     Financial Freedom declared Gray's loan due and payable for failure to pay force-placed insurance charges and property taxes on June 4, 2015.  It commenced a foreclosure action against Mr. Gray and the Gray Property on November 24, 2015.

78.     Financial Freedom charged inspection fees to Gray's mortgage account while he and Monica Gray occupied the Gray Property and were in contact with Financial Freedom.  It first charged an inspection fee to Gray's mortgage account on March 25, 2011.  Earl Gray,

---

[8] Financial Freedom force-placed hazard insurance it procured from MIC General on Gray's Property in November 2017.  Upon information and belief, MIC General is a subsidiary of National General Holdings Corp., which acquired the lender-placed insurance business of QBE subsidiary QBE North America, in October 2015.

Monica Gray and her children, Justin Gray and Jasmine Gray-Oliver, occupied the Gray Property in March 2011. Financial Freedom next charged Gray's mortgage account for an inspection fee on July 21, 2015. There had been no change in occupancy of the Gray Property from March 2011 to July 2015. Nonetheless, the month after it declared Gray's loan in default, it began charging monthly inspection fees without regard to occupancy. Financial Freedom charged Gray's mortgage account the following inspection fees:

| | |
|---|---|
| July 21, 2015 | $20.00 |
| August 24, 2015 | $20.00 |
| September 23, 2015 | $20.00 |
| October 28, 2015 | $20.00 |
| December 2, 2015 | $20.00 |
| January 6, 2016 | $20.00 |
| February 12, 2016 | $20.00 |
| February 16, 2016 | $20.00 |
| March 16, 2016 | $20.00 |
| April 19, 2016 | $20.00 |
| May 23, 2016 | $20.00 |
| June 27, 2016 | $20.00 |
| August 1, 2016 | $20.00 |
| September 1, 2016 | $20.00 |
| October 4, 2016. | $20.00 |

79.     In addition to Plaintiffs continually occupying the Gray Property during this period, Monica Gray was in regular contact with Financial Freedom concerning the Gray

Property.  For example, Financial Freedom sent correspondence addressed to Monica Gray at the

Gray Property in July 2016.

     80.     Earl Gray passed away on December 3, 2016.

## CLASS ALLEGATIONS

     81.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly

situated.  Plaintiffs seek to represent the following Class and Subclass:

> Nationwide class:
> All borrowers who, within the applicable statutes of limitation, (a) were charged
> for force-placed insurance coverage by Financial Freedom and/or its companies'
> affiliates, entities, or subsidiaries, which was obtained through the QBE Defendants
> and/or MIC General and/or the affiliates, entities, or subsidiaries of the QBE Defendants
> and/or MIC General and/or (b) were charged for inspection fees by Financial Freedom.
> Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board
> members, directors, officers, and/or employees.
>
>
> New Jersey Subclass as to Counts III, IV and V
> New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et. seq.*
>
> All borrowers who, within the applicable statutes of limitation, (a) were
> charged for force-placed insurance coverage placed on property located within
> the State  of New Jersey by Financial Freedom and/or its companies'
> affiliates, entities, or subsidiaries, which was obtained through the QBE
> Defendants and/or MIC General and/or the affiliates, entities, or subsidiaries of
> the QBE Defendants and/or MIC General and/or (b) were charged for
> inspection fees by Financial Freedom.  Excluded from this class are
> Defendants, their affiliates, subsidiaries, agents, board members, directors,
> officers, and/or employees.

     82.     Plaintiffs reserve the right to modify or amend the definitions of the

proposed Class and Subclasses before the Court determines whether certification is appropriate.

     83.     Defendants subjected Plaintiffs and the respective Class members to the

same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**Numerosity**

84.     The proposed Class is so numerous that joinder of all members would be impracticable.  Defendants sell and service over one hundred thousand mortgage loans and insurance policies in the State of New Jersey and nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.   The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**Commonality**

85.     There are questions of law and fact that are common to Plaintiffs' and Class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

> a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Financial Freedom and CIT Bank had no risk of loss;

> b.  Whether Financial Freedom charged borrowers for unnecessary and unreasonable inspection fees.

> c.  Whether Financial Freedom issued bogus vacancy reports in order to call in borrower's reverse mortgages as "due and payable."

> d.  Whether Financial Freedom breached the mortgage contracts with Gray and the Class by force placing unnecessary insurance coverage which was not required by and/or exceed the amount required by law or the borrower's mortgages, selecting force-placed insurance policies in order to receive illegal kickbacks (including unwarranted

commissions and reinsurance payments) and by charging the inflated costs to Gray and the Class;

e.  Whether Financial Freedom breached the mortgage contracts with Gray and the Class by charging for inspection fees that were neither reasonable nor necessary;

f.  Whether Financial Freedom breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated charges for insurance being imposed on Gray and the Class;

g.  Whether Defendants manipulated force-placed insurance purchases in order to maximize their profits to the detriment of Gray and the Class;

h.  Whether Financial Freedom and its affiliates performed any work or services in exchange for the "compensation" it collected in connection with the force placed insurance;

i.  Whether Defendants employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission by Defendants' creating an arrangement which incentivized Financial Freedom to select force-placed policies in order to receive illegal kickbacks (including unwarranted commissions and reinsurance payments) in violation of the New Jersey Consumer Fraud Act; N.J.S.A. 56:8-1 *et. seq.;*

j.  Whether Financial Freedom employed an unconscionable commercial practice, misrepresentation, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission by charging Gray and other borrowers unwarranted inspection fees in violation of the New Jersey Consumer Fraud Act; N.J.S.A. 56:8-1 *et. seq.*

k.  Whether the QBE Defendants and MIC General intentionally and unjustifiably interfered with the Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio; and

l. Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

**Typicality**

86.    Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the respective Class and Subclasses claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

**Adequacy of Representation**

87.    Plaintiffs are adequate representatives of the Class they seek to represent and will fairly and adequately protect the interests of that Class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed Class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

88.    To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**Requirements of Fed. R. Civ. P. 23(b)(3)**

89.    The questions of law or fact common to Plaintiffs' and each Class Member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed Class members are based on the force-placed insurance policies that Defendants unlawfully secured, and their deceptive and egregious actions involved in securing the force-placed policy, imposing related charges, and imposing unwarranted inspection fees on borrowers' mortgage accounts.

90.    Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

33

91.     As a result, when determining whether common questions predominate,
courts focus on the liability issue, and if the liability issue is common to the Class as is the case
at bar, common questions will be held to predominate over individual questions.

**Superiority**

92.     A class action is superior to individual actions in part because of the non-
exhaustive factors listed below:

> (a) Joinder of all Class members would create extreme hardship and inconvenience
> for the affected customers as they reside all across the states;
>
> (b) Individual claims by Class members are impractical because the costs to pursue
> individual claims exceed the value of what any one Class member has at stake.   As
> a result, individual Class members have no interest in prosecuting and controlling
> separate actions;
>
> (c) There are no known individual Class members who are interested in individually
> controlling the prosecution of separate actions;
>
> (d) The interests of justice will be well served by resolving the common disputes of
> potential Class members in one forum;
>
> (e) Individual suits would not be cost effective or economically maintainable as
> individual actions; and
>
> (f) The action is manageable as a class action.

**Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

93.     Prosecuting separate actions by or against individual Class members would
create a risk of inconsistent or varying adjudications with respect to individual Class
members that would establish incompatible standards of conduct for the party opposing the
class.

94.     Defendants have acted or failed to act in a manner generally applicable to the
Class, thereby making appropriate final injunctive relief or corresponding declaratory relief
with respect to the Class as a whole.

## COUNT I
## BREACH OF CONTRACT
## (AGAINST FINANCIAL FREEDOM and CIT BANK, N.A.)

95.     Plaintiffs reallege and incorporate the allegations above as if fully set forth herein and further alleges as follows.

96.     Plaintiffs and all similarly situated Class members have mortgages that were owned and/or serviced by Financial Freedom.

97.     Plaintiffs and these Class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by Financial Freedom.  The force-placed provisions from Plaintiffs' mortgages are set forth above in paragraph 71 above and excerpts from a true and correct copy of Earl Gray's mortgage agreement is attached hereto as Exhibit A.

98.     Plaintiffs' mortgage requires that they maintain hazard insurance on their property and provides that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the cost of coverage to the borrower.

99.     Financial Freedom charges borrowers for force placed insurance which is not permitted by the mortgage agreement and exceeds the amount and type of insurance required by the mortgage agreement.  Financial Freedom also charges borrowers inflated costs it attributes to force-placed policies which it selects in order to gain unearned "commissions" or kickbacks, reinsurance premiums, as well as bundled administrative services and other impermissible benefits.  These so-called "costs", however, are extraneous to the actual cost of the insurance placed Plaintiffs' property.  Financial Freedom's conduct exceeds the bounds of what is "necessary" to protect Financial Freedom's rights or risk in the collateral for borrowers' mortgage loans.  Financial Freedom breached the mortgage agreements by, among other things, imposing inflated charges on Plaintiffs and Class members mortgage accounts for the sole purpose of its financial gain.

100.    Financial Freedom also breached Plaintiffs' mortgage agreements by charging Plaintiffs' and the Class for excessive and unnecessary force-placed insurance coverage, including retroactive coverage, as such coverage does not protect Financial Freedom's rights in their collateral or cover their risk.

101.    With respect to the loans serviced by Financial Freedom which have gone into foreclosure following Financial Freedom's placement of force placed insurance, as with Plaintiffs, defendant CIT Bank has breached the mortgage agreement by commencing foreclosure proceedings based on the wrongfully placed and unnecessary force placed insurance in violation of the mortgage agreement.

102.    Plaintiffs and the Class members have suffered damages as a result of Financial Freedom's and CIT Bank's breaches of contract.

## COUNT II
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING
## (AGAINST FINANCIAL FREEDOM and CIT BANK, N.A.)

103.    Plaintiffs reallege and incorporate the above allegations as if fully set forth herein and further allege as follows.

104.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

105.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

106.    Plaintiffs' and the Class Members' mortgage contracts allow Financial Freedom to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

107.    Financial Freedom was afforded substantial discretion in force-placing insurance coverage.  It was permitted to unilaterally choose the company from which it purchased force-placed insurance and negotiate the price of the coverage it procured.  Financial Freedom had an obligation to exercise its discretion in good faith, and not capriciously or in bad faith.

108.    The purpose of the mortgage clause allowing a lender, like Financial Freedom, to force place insurance is to protect the lender's interest in the property that is collateral for the mortgage.  Financial Freedom breached the implied covenant of good faith and fair dealing by making additional profits at Plaintiffs' expense by force-placing insurance on their property and receiving kickbacks on that insurance, rather than placing insurance to protect its interest in the property.  Financial Freedom further breached the implied covenant of good faith and fair dealing by, among other things:

> (a) Manipulating the force-placed insurance market by selecting insurers (here, QBE Insurance and MIC General and their affiliates) that will give kickbacks to Financial Freedom and issue excess insurance coverage not necessary to cover Financial Freedom's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased through QBE FIRST from QBE Insurance and MIC General without seeking a competitive price;

> (b) Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies to generate kickbacks and other wrongful consideration to maximize their own profits;

> (c) Assessing inflated and unnecessary charges for insurance against Plaintiffs and the Class and misrepresenting the charges as reflecting the cost of the insurance;

> (d) Allowing Financial Freedom to collect a percentage of the premium amount that it charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced policies possible;

> (e) Charging Plaintiffs and the Class for commissions when the insurance is prearranged, and no commission is earned;

(f)  Charging Plaintiffs the cost of having the vendor perform its obligation of administering its entire mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(g)  Force-placing insurance coverage that is duplicative of existing coverage, or in excess of what is required by borrowers' mortgage agreements;

(h)  Force-placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(i)  Charging Plaintiffs and the Class inflated charges attributed to insurance due to the captive reinsurance arrangement.

109.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

## COUNT III

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT (AGAINST FINANCIAL FREEDOM AND CIT BANK, N.A.)

110.    Plaintiffs and the New Jersey Subclass reallege and incorporate the paragraphs above as if fully set forth herein and further allege as follow.

111.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the "NJCFA"), prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation…in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.  Financial Freedom engaged in unconscionable commercial practices, deceptive acts, and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  The Financial Freedom Defendants had an exclusive relationship with Financial Freedom's vendor and preferred insurance carrier whereby it would select force-placed insurance policies in order to receive improper compensation through illegal kickbacks, or

captive reinsurance arrangements based on a percentage of the insurance policy's premium, and charge the improper compensation to Plaintiffs and the New Jersey Subclass.

112.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiffs and the New Jersey Subclass.  Upon information and belief, Financial Freedom, with the involvement, knowledge, cooperation and support of its force-placed insurance providers, sent form letters to Plaintiffs stating that Financial Freedom would order force-placed coverage because Plaintiffs did not provide evidence of insurance in force on the Gray Property from 2011 through November 2017.

113.    For example, Financial Freedom a mailed a notice to Earl Gray dated October 3, 2013 stating that "[t]he hazard insurance policy Financial Freedom, a division of OneWest Bank, FSB purchased on your behalf expires in 30 days."  It further stated that "if we purchase insurance on your behalf, the cost of that insurance will be charged to the outstanding balance of your loan and, if there are insufficient funds in your line of credit, arrangements will have to be made for repayment."  The October 2013 notice stated that the "approximate cost of the Lender-Placed insurance will be $2,230.90" for the period 11/02/2013 to 11/02/2014.

114.    Financial Freedom mailed another notice to Earl Gray dated November 2, 2015 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2015.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2015 notice stated that the "insurance charges" were $2,230.90 for the period 11/02/2015 to 11/02/2016.

115.    Financial Freedom mailed another notice to Earl Gray dated November 9, 2017 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2017.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2017 notice stated that the "insurance charges" were $2,357.06 for the period 11/02/2017 to 11/02/2018.

116.     Financial Freedom represented in the letters that the "cost" of insurance for the lender-placed coverage would be added to Gray's loan balance. Defendants further represented that Gray could obtain his own coverage, send proof of such coverage to Defendants, and they would refund any unearned portion of the premium.

117.     Financial Freedom deceived and misrepresented to Gray and the New Jersey Subclass in making these statements, creating the impression that they were being charged for the cost of necessary insurance coverage. In fact, they were being charged an amount greater than the cost of insurance because Financial Freedom had selected the QBE Insurance and MIC General insurance policies because the QBE Defendants and MIC General paid kickbacks, reinsurance profits, and other wrongful benefits to Financial Freedom. The insurance charges were inflated to pay for the kickbacks and other unlawful benefits the QBE Defendants and MIC General provided to Financial Freedom. In addition, Plaintiff and the New Jersey Subclass could not obtain backdated voluntary insurance coverage.

118.     Financial Freedom engaged in unconscionable commercial conduct by imposing unwarranted inspection fees on the mortgage accounts of Plaintiffs and members of the Class. Financial Freedom imposed 16 monthly inspection charges on Gray's mortgage account despite Gray and the Plaintiffs obviously living at the premises and in contact with the lender.

119.     The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction." N.J.S.A. 56:9-19.

120.     Plaintiffs and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A. 56:8-1(d). Gray was a "senior citizen" as that term is defined in N.J.S.A. 56:8-1(f).

121.     Plaintiffs and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of Financial Freedom's unconscionable

practices.  The Financial Freedom Defendants had an exclusive relationship with the QBE

Defendants and MIC General whereby Financial Freedom agreed to select the QBE Defendants'

and MIC General's force-placed policies because they provided kickbacks and other improper

consideration, and imposed the costs of the kickbacks and wrongful consideration on Plaintiffs

and the New Jersey Subclass.  Financial Freedom made this selection because the QBE

Defendants and MIC General would kick back a set percentage of the net written premiums to

Financial Freedom as a "commission," or enter into captive reinsurance agreements with the

Financial Freedom, as a means to funnel financial benefits to it.

122.    Pursuant to the terms of the standard form mortgage agreements used by Financial

Freedom, it would purchase the required hazard coverage and charge Gray and the New Jersey

Subclass' escrow accounts amounts attributed to insurance premiums.  Thus, as part of the

scheme by Defendants, Financial Freedom inflated its charges to Gray and the New Jersey

Subclass, which it attributed to the QBE Defendants' and MIC General's insurance premiums,

but which included kickbacks, reinsurance profits, and other wrongful benefits they conveyed to

Financial Freedom.

123.    Plaintiffs and the New Jersey Subclass have a private right of action against

Financial Freedom and its entitles them to recover, in addition to their actual damages, a

threefold award of the damages sustained by any person's interest, as well as an award of

reasonable attorney's fees, filing fees and reasonable costs of suit.  N.J.S.A. 56:8-19.

**WHEREFORE,** Plaintiffs, on behalf of themselves and the New Jersey Subclass,

demands judgment against the Financial Freedom Defendants for compensatory damages, pre-

and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief,

costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT IV

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (AGAINST THE QBE DEFENDANTS AND MIC GENERAL)

124.    Plaintiffs and the New Jersey Subclass reallege and incorporate the paragraphs above as if fully set forth herein and further allege as follows:

125.    The NJCFA prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A. 56:8-2.

126.    The QBE Defendants, and MIC General have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  The QBE Defendants and MIC General, had a relationship with the Financial Freedom Defendants, whereby they incentivized Financial Freedom to select their force-placed insurance policies to receive kickbacks, or access to lucrative reinsurance agreements, knowing that Financial Freedom would impose inflated charges upon Gray and the New Jersey Subclass in amounts equal to the kickbacks it received from the QBE Defendants and MIC General.  The QBE Defendants and MIC General kicked back a set percentage of the inflated premiums to the Financial Freedom Defendants as compensation or entered into captive reinsurance agreements with the Financial Freedom Defendants or their affiliates, to funnel financial benefits to them, while Financial Freedom passed on the charges for the kickbacks and other wrongful consideration to Gray and members of the New Jersey Subclass.

127.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiffs and the New Jersey Subclass.  Financial Freedom, as part of their scheme to defraud Plaintiffs and the New Jersey Subclass and with the approval of the QBE Defendants and MIC General, sent form letters to Plaintiffs stating that Financial Freedom would order force-placed coverage because Plaintiffs did not provide evidence of insurance in force on the property.  Defendants represented in the letter that the "cost" of insurance for the lender-placed coverage would be added to Plaintiff's loan balance.  Defendants further represented that Plaintiff could obtain his own coverage, send proof of such coverage to Defendants, and they would refund any unearned portion of the premium.

128.    For example, Financial Freedom a mailed a notice to Earl Gray dated October 3, 2013 stating that "[t]he hazard insurance policy Financial Freedom, a division of OneWest Bank, FSB purchased on your behalf expires in 30 days."  It further stated that "if we purchase insurance on your behalf, the cost of that insurance will be charged to the outstanding balance of your loan and, if there are insufficient funds in your line of credit, arrangements will have to be made for repayment."  The October 2013 notice stated that the "approximate cost of the Lender-Placed insurance will be $2,230.90" for the period 11/02/2013 to 11/02/2014.

129.    Financial Freedom mailed another notice to Earl Gray dated November 2, 2015 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2015.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2015 notice stated that the "insurance charges" were $2,230.90 for the period 11/02/2015 to 11/02/2016.

130.    Financial Freedom mailed another notice to Earl Gray dated November 9, 2017 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2017.  Even

though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance." The November 2017 notice stated that the "insurance charges" were $2,357.06 for the period 11/02/2017 to 11/02/2018.

131.    Defendants deceived and misrepresented Gray and the New Jersey Subclass in making these statements, creating the impression that they were being charged for the cost of the necessary insurance coverage.  In fact, they were being charged an amount greater than the cost of the insurance coverage because Financial Freedom had selected the QBE Insurance and MIC General insurance policies because the QBE Defendants and MIC General paid kickbacks, reinsurance profits, and other wrongful benefits to the Financial Freedom Defendants.  The insurance charges were inflated to pay for the kickbacks and other unlawful benefits the QBE Defendants and MIC General provided to Financial Freedom; inflated charges that were passed on to Plaintiffs and the New Jersey Subclass.  In addition, Plaintiffs and the New Jersey Subclass could not obtain backdated voluntary insurance coverage.

132.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction. N.J.S.A. 56:9-19.

133.    Gray and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A. 56:8-1(d), and were "senior citizens" as that term is defined in N.J.S.A. 56:8-1(f), when they suffered the violations of the NJCFA identified herein.

134.    Gray and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the QBE Defendants' and MIC General's unfair and unconscionable practices.  The QBE Defendants and MIC General employed a scheme

44

pursuant to which they would pay kickbacks, ceded premiums from riskless reinsurance agreements and discounted outsourcing services to Financial Freedom, in exchange for Financial Freedom selecting the QBE Defendants' and MIC General's force-placed insurance policies with inflated premiums that included kickbacks and other wrongful benefits, with the knowledge that Financial Freedom would impose the inflated charges upon borrowers which it represented were for the cost of the insurance, but which passed on to borrowers the cost of the kickbacks and other unlawful benefits the QBE Defendants and MIC General provided to Financial Freedom.

135.    Pursuant to the terms of the standard form mortgage agreements used by Financial Freedom, it would purchase the hazard coverage and charge Gray and the New Jersey Subclass' escrow accounts amounts attributed to insurance premiums.  Thus, as part of the scheme by Defendants, Financial Freedom charged Gray and the New Jersey Subclass inflated amounts it attributed to the QBE Defendants' and MIC General's premiums, but which included kickbacks, reinsurance profits, and other wrongful benefits they conveyed to Financial Freedom.

136.    Plaintiff and the New Jersey Subclass have a private right of action against the QBE Defendants and the MIC Defendants and it entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person's interest, as well as an award of reasonable attorney's fees, filing fees and reasonable costs of suit.  N.J.S.A. 56:8-19.

**WHEREFORE,** Plaintiff, on behalf of himself and the New Jersey Subclass, demands judgment against the QBE Defendants and MIC General for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT V

## CONSPIRACY TO DEFRAUD
## (AGAINT ALL DEFENDANTS)

137.    Plaintiffs and the New Jersey Subclass reallege and incorporate the paragraphs above as if fully set forth herein and further allege as follow.

138.    Defendants acted in concert to defraud Plaintiffs and the New Jersey Subclass by means of an agreement between Defendants to injure Plaintiffs and the New Jersey Subclass.

139.    The QBE Defendants and MIC General had agreements with the Financial Freedom Defendants or their affiliates, whereby they would incentivize Financial Freedom to select their force-placed insurance policies in order to gain access to kickbacks, profits from reinsurance agreements and other wrongful consideration, knowing that Financial Freedom would impose inflated charges upon Plaintiffs and the New Jersey Subclass in amounts equal to include the kickbacks and other wrongful consideration.  The QBE Defendants and MIC General would kick back a set percentage of the inflated premiums to the Financial Freedom Defendants or their affiliates as a commission or enter into captive reinsurance agreements with the Financial Freedom Defendants or its affiliates as a means to funnel financial benefits to them as compensation for selecting their force-placed insurance products.

140.    Plaintiffs and the New Jersey Subclass have been injured as a direct and proximate result of Defendants' agreement to defraud Plaintiffs and the New Jersey Subclass. The Financial Freedom Defendants had an exclusive relationship with the QBE Defendants and MIC General whereby Financial Freedom agreed to select the QBE Defendants' and MIC General's force-placed policies because the QBE Defendants and MIC General would kick back a set percentage of the premiums to the Financial Freedom Defendants or enter into captive reinsurance agreements with them as a means to funnel financial benefits to them.  Financial

46

Freedom would then charge inflated costs which included the undisclosed kickbacks and other wrongful benefits to Plaintiffs and the New Jersey Subclass.

141.    Defendants conduct in furtherance of the agreement violated the NJCFA and caused Plaintiffs and the New Jersey Subclass to suffer damages.

142.    Each of the Defendants understood the general objectives of the agreement, accepted them, and agreed, either explicitly or implicitly, to do their part to further them.

**WHEREFORE,** Plaintiff, on behalf of himself and the New Jersey Subclass, demands judgment against the QBE Defendants and MIC General for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

### COUNT VI

### TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP (AGAINST THE QBE DEFENDANTS AND MIC GENERAL)

143.    Plaintiffs reallege and incorporate the allegations above as if fully set forth herein and further alleges as follows.

144.     Plaintiffs and the Class members have advantageous business and contractual relationships with Financial Freedom pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts. For example, Plaintiffs and the Class have a right not to be charged for duplicative coverage and a right not to have inflated charges imposed on their mortgage accounts in bad faith, which include costs for unlawful consideration exchanged between the Defendants in connection with forced-place insurance.

145.    The QBE Defendants, and MIC General had knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and Financial Freedom.  The QBE Defendants and MIC General were not parties to

47

the mortgage contracts, nor were they third-party beneficiaries of the mortgage contracts. Further, the QBE Defendants and MIC General did not have any beneficial or economic interest in the mortgage contracts.

146.   The QBE Defendants and MIC General intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with the Financial Freedom Defendants and their affiliates, whereby the QBE Defendants and MIC General provided compensation (kickbacks, reinsurance, and low cost services) to Financial Freedom in exchange for the exclusive right to force-place coverage, the inflated costs for which were purposefully and knowingly charged to Plaintiffs and the Class.

147.   As a result of the QBE Defendants' and MIC General's interference with Plaintiffs' mortgage agreement, their mortgage loans were assessed non-designated costs of Defendants, including kickbacks, reinsurance fees and ceded premiums, and low-cost loan tracking services for the Financial Freedom loan portfolio.

148.   Plaintiffs and the Class have been damaged as a result of the QBE Defendants' and MIC General's interference with their mortgage contracts by being charged bad faith, inflated, duplicative and illegal charges in connection with the force-placed insurance in contravention of their rights under the mortgages.

**COUNT VII**
**VIOLATION OF RACKETEER INFLUENCED AND**
**CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)**
**(AGAINST ALL DEFENDANTS)**

149.   Plaintiffs reallege and incorporate the above allegations as if fully set forth herein and further alleges as follows.

150.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

151.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce consisted of Financial Freedom, CIT Bank, QBE Insurance, QBE FIRST and MIC General.

152.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class Members to pay for force-placed insurance through a scheme that inflated the charges attributed to such coverage to cover kickbacks and expenses associated with monitoring Financial Freedom's entire loan portfolio. Defendants shared the bounty of their enterprise, *i.e.*, by sharing the profits generated by the joint scheme.

153.    The RICO enterprise functioned over a period of years as a continuing unit and maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

154.    Financial Freedom, CIT Bank, QBE Insurance, QBE FIRST and MIC General conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

155.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.   For example, the QBE Defendants and MIC General, with the approval of Financial Freedom, sent standardized form letters to Plaintiffs on Financial Freedom letterhead, stating that Financial Freedom had ordered force-placed coverage because Plaintiffs had not provided evidence of insurance on their property.

156.    Financial Freedom a mailed a standardized form letter to Earl Gray dated October 3, 2013 stating that "[t]he hazard insurance policy Financial Freedom, a division of OneWest Bank, FSB purchased on your behalf expires in 30 days."  It further stated that "if we purchase insurance on your behalf, the cost of that insurance will be charged to the outstanding balance of your loan and, if there are insufficient funds in your line of credit, arrangements will have to be made for repayment."  The October 2013 notice stated that the "approximate cost of the Lender-Placed insurance will be $2,230.90" for the period 11/02/2013 to 11/02/2014.

157.    Financial Freedom mailed another standardized form letter to Earl Gray dated November 2, 2015 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2015.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2015 letter stated that the "insurance charges" were $2,230.90 for the period 11/02/2015 to 11/02/2016.

158.    Financial Freedom mailed another standardized form letter to Earl Gray dated November 9, 2017 stating that Financial Freedom had "purchased insurance coverage effective 11/02/2017.  Even though Financial Freedom, a division of CIT Bank has advanced payment for this coverage, you are responsible for the cost of this insurance."  The November 2017 letter stated that the "insurance charges" were $2,357.06 for the period 11/02/2017 to 11/02/2018.

50

159.    The letters sent to Earl Gray on October 3, 2013, November 2, 2015 and November 9, 2017 were materially false, misleading and deceptive and omitted material information.  For example:

      a.  Defendants represented that Financial Freedom was charging Plaintiffs the "cost" of the force placed insurance, but failed to inform Plaintiffs that the charges identified in the letters were not the actual "cost" of the insurance but the cost plus extraneous kickbacks and other financial inducements shared among the Defendants and charged to Plaintiffs.

      b.  Defendants also represented that Plaintiffs could obtain their own coverage, send proof of such coverage to Defendants, and they would refund any unearned portion of the premium but failed to inform Plaintiffs that they could not obtain retroactive voluntary coverage.

      c.  As a result of the unnecessary, duplicative and excessive force placed insurance charges to Plaintiffs and other members of the Class, Defendant CIT Bank, of which Financial Freedom operates as a division, has been able to commence foreclosure proceedings.

160.    Defendants deceived and misrepresented to Plaintiffs and the Class in making these statements, creating the impression that they were being charged for the cost of the necessary insurance coverage.  In fact, they were being charged an amount greater than the cost of the insurance because Financial Freedom had selected the QBE Insurance and MIC General insurance policies in order to obtain the kickbacks, reinsurance profits, and other wrongful benefits from QBE Insurance and MIC General, and for unnecessary, duplicative and backdated coverage.

161.    Defendants also misrepresented that Plaintiffs could replace the coverage with a voluntary policy, when in fact, that was not possible to obtain retroactive voluntary coverage. Defendants' misrepresentations, deceptive statements and false pretenses were included in letters to Plaintiffs dated October 3, 2013, November 2, 2015 and November 9, 2017.

162.    In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the force-placed insurance premiums that Plaintiffs were charged represented insurance authorized by the mortgage agreement and the actual "cost" of the

insurance, and/or that Defendants were authorized to impose costs extraneous to the insurance, including kickbacks and improper expenses, under the mortgage agreement. Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs for unnecessary and duplicative insurance and unreasonably high premiums and would have influenced Plaintiffs decisions whether to pay the insurance charges, take steps to obtain the voluntary coverage or contest the charges. Such letters were sent to Plaintiffs dated October 3, 2013, November 2, 2015 and November 9, 2017.

163. For the purpose of executing the scheme to defraud, Defendants sent, mailed and transmitted, or caused to be sent, mailed or transmitted, in interstate or foreign commerce, numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class Members that they could impose inflated charges on Plaintiffs and Class Members attributed to force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class Members, in violation of the wire fraud statutes

164. Financial Freedom, CIT Bank, QBE Insurance, QBE FIRST and MIC General directed and controlled the enterprise by:

    a. developing and implementing guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance;

    b. drafting of the language of the letters and correspondence to borrowers that was specifically designed to deceive borrowers related to what was the "cost" of the insurance purchased for them;

    c. directing, controlling, and creating an enterprise and arrangement where Financial Freedom received unearned "commissions" (ultimately charged to borrowers) for performing no work to earn said "commissions";

    d. directing, controlling, and creating an enterprise and arrangement where Financial Freedom received reinsurance revenues without incurring any real risk associated with the reinsurance relationship and not disclosing same to borrowers;

e.   directing, controlling, and creating an enterprise and program where Financial Freedom never charged the borrowers its actual or effective cost to procure the lender placed policies;

f.   directing, controlling, and creating an enterprise and program where the Defendants caused debits to the borrowers' escrow accounts amounts which are not the actual or effective cost for lender placed insurance;

g.   designing and directing an exclusive enterprise arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance and ultimately, provide CIT Bank with colorable grounds for commencing foreclosure proceedings based on the unlawful and excessive force placed insurance charges. The charges are inflated to provide Financial Freedom and its affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted services, such as loan tracking for the entire Financial Freedom mortgage portfolio, and/or to provide the Financial Freedom Defendants with lucrative reinsurance arrangements.  The QBE Defendants and MIC General benefit by securing business from Financial Freedom while the QBE Defendants and MIC General provide kickbacks to Financial Freedom at the expense of the borrowers upon whom are imposed inflated charges which include the wrongful consideration. CIT Bank benefits by being able to commence foreclosure proceedings against Plaintiffs and other members of the Class based on the excessive, unnecessary and duplicative force placed insurance charges;

h.   developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered lapsed time periods where no claims were made and/or resulted in "double coverage;"

i.   developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges; and

j.   ultimately providing a "basis" for CIT Bank, to commence foreclosure proceedings on the Financial Freedom mortgages with outstanding balances for the duplicative, unnecessary and excessive force placed insurance charges.

165.   In order to further its control and direction of the enterprise, the QBE Defendants and MIC General paid bribes and kickbacks to the Financial Freedom Defendants in the form of unearned commissions, reinsurance premiums, and below cost services.

53

166.     By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class Members in the form of unreasonable and unnecessary force-placed insurance premiums.

**WHEREFORE** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VIII
## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS, 18 U.S.C. § 1962(d)
## (AGAINST ALL DEFENDANTS)

167.     Plaintiffs reallege and incorporate the allegations above as if fully set forth herein. Plaintiffs further allege as follows:

168.     At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

169.     Defendants agreed that the QBE Defendants and MIC General would be Financial Freedom's exclusive force-placed insurance providers and that Defendants would extract monies from Financial Freedom customers under the guise of insurance costs.  Defendants also agreed that the QBE Defendants' and MIC General would pay kickbacks to Financial Freedom. Defendants agreed that CIT Bank would commence foreclosure proceedings under the guise of outstanding amounts owed for the duplicative, unnecessary and excessive force placed insurance charges imposed on Plaintiffs and other members of the Class.

170.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

171.     As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class Members suffered damages in the form of fraudulently inflated charges attributed to force-placed insurance premiums.

**WHEREFORE** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT IX
## VIOLATIONS OF THE TRUTH IN LENDING ACT,
## 15 U.S.C. § 1601, *et seq.*
## (against FINANCIAL FREEDOM and CIT BANK)

172.    Plaintiffs reallege and incorporate the above allegations as if fully set forth herein and further alleges as follows

173.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

174.    Financial Freedom and/or CIT Bank are "creditors" as defined by TILA because they owned or serviced Plaintiffs' mortgage and changed the terms of the mortgage so as to create new mortgage obligation, of which Financial Freedom and CIT Bank were the creditors.

175.    Pursuant to TILA, Financial Freedom and CIT Bank were required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

176.    Financial Freedom and CIT Bank violated TILA, specifically 12 C.F.R. § 226.17(c), when they: (i) added charges attributed to force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, or other profiteering involving Financial Freedom and CIT Bank, or their affiliates as a result of the purchase of force-placed insurance.

177.    When Financial Freedom and CIT Bank changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of Financial Freedom and CIT Bank's interests in the property, they changed the finance charge and the total

amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, Financial Freedom and CIT Bank were then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, Financial Freedom and CIT Bank increased the principal amount under Plaintiffs' mortgage when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

178.    Financial Freedom and CIT Bank adversely changed the terms of Plaintiffs' loan after origination in order to allow themselves or their affiliates to receive a kickback on force-placed insurance premiums and to commence foreclosure proceedings as a result of the outstanding, duplicative, and excessive force placed insurance charges.  These kickbacks and excess, duplicative insurance charges are not authorized in the mortgage in any clear and unambiguous way.  Financial Freedom never disclosed to borrowers the amount of the "compensation" or other unearned profits paid to itself or an affiliate.

179.    Financial Freedom also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect its and/or CIT Bank's interest in the property securing the mortgages.

180.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Financial Freedom's kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the Defendants Financial Freedom, CIT Bank, the QBE Defendants, MIC General and their affiliates and was concealed from borrowers.

181.    Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from Financial Freedom and CIT Bank's violations of TILA.

182.    As a result of Financial Freedom's and CIT Bank's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

183.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by Financial Freedom and CIT Bank as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE** Plaintiffs on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Financial Freedom and CIT Bank, awarding actual damages and a penalty of $500,000.00 or 1% of CIT Bank's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by Financial Freedom and CIT Bank, as provided by 15 U.S.C. § 1640(a)(3).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated individuals, demands judgment against Defendants as follows:

(1)    Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class and the New Jersey Subclass;

(2)    Enjoining Defendants from continuing the acts and practices described above;

(3)    Awarding damages sustained by Plaintiffs and the Class as a result of the Financial Freedom Defendant's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)    Awarding Plaintiffs and the New Jersey Subclass compensatory, treble, and punitive damages, injunctive relief, declaratory relief, attorneys' fees, and costs, and civil penalties under the New Jersey Consumer Fraud Act;

(5)    Awarding Plaintiffs and the New Jersey Subclass compensatory, treble, and punitive damages, injunctive relief, declaratory relief, attorneys' fees, and costs, and civil penalties as a result of Financial Freedom, CIT Bank, QBE Insurance, QBE FIRST and MIC General's civil conspiracy under New Jersey state law;

(6)      Awarding damages sustained by Plaintiffs and the Class as a result of the QBE Defendants and MIC General's tortious interference with the mortgage agreement;

(7)      Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute;

(8)      Awarding compensatory damages and a penalty of $500,000 or 1% of CIT Bank's net worth, and attorneys' fees and costs under the federal TILA statute

(9)      awarding punitive damages;

(10)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses; and

(11)     Awarding such other and further relief the Court deems just and equitable.

DATED: February 2, 2018

                      Law Offices of Roosevelt N. Nesmith LLC

                      By: s/Roosevelt N. Nesmith_____
                         ROOSEVELT N. NESMITH

                      363 Bloomfield Avenue, Suite 2C
                      Montclair, NJ 07042
                      Tel: (973) 259-6990
                      Fax: (866) 848-1368

                      Catherine E. Anderson
                      *canderson@gslawny.com*
                      Giskan Solotaroff & Anderson LLP
                      217 Centre Street, 6th Floor
                      New York, NY 10013
                      (212) 847-8315

                      Attorneys for Monica Gray, as Executrix of the
                      Estate of Earl Gray, and Trustee of the Interest of
                      Jasmine Gray-Oliver, and Justin Gray,
                      on behalf of themselves
                      and all others similarly situated